# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THOMAS BURNETT, SR., *et al.*,      :
                                    :
      Plaintiffs,                 :
                                    :
    v.                              : Civil Action No. 02-1616 (JR)
                                    :
AL BARAKA INVESTMENT AND            :
DEVELOPMENT CORPORATION, *et al.*,  :
                                    :
      Defendants.                 :

## MEMORANDUM OPINION

In this action, more than two thousand victims, family members of victims or representatives of victims of the terrorist attacks of September 11, 2001, seek to hold accountable the persons and entities that funded and supported the international terrorist organization known as al Qaeda, which is now generally understood to have carried out the attacks. Plaintiffs have sued nearly two hundred entities or persons -- governments, government agencies, banks, charitable foundations, and individuals, including members of the Saudi royal family -- broadly alleging that each of them, in one way or another, directly or indirectly, provided material support, aided and abetted, or conspired with the terrorists who perpetrated the attacks. The Third Amended Complaint ("3AC") asserts claims under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602 et seq., the Torture Victim Protection Act (TVPA), 28 U.S.C. § 1350 note, the Antiterrorism Act (ATA), 18 U.S.C. § 2331 et seq., the Alien Tort

Claims Act (ATCA), 28 U.S.C. § 1350, the Racketeer Influenced and
Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 <u>et seq.</u>, and
the common law theories of aiding and abetting, conspiracy,
wrongful death, survival, intentional infliction of emotional
distress, negligence, and negligent infliction of emotional
distress.  Plaintiffs demand damages, including punitive damages,
in excess of one trillion dollars.

     As of the date of this decision, twenty-seven
defendants have entered appearances in this court, and nineteen
have filed motions to dismiss.[1]  On June 24, 2003, I heard oral
arguments on the first five dispositive motions that were fully
briefed and ripe for decision.  One of those five motions is
moot, because the movant has been dismissed from this action.
The other four raise issues applicable to many, if not most, of
the defendants:  Al Rajhi Banking & Investment Corporation (Al
Rajhi) asserts that the Southern District of New York has
exclusive subject matter jurisdiction over claims arising from
the September 11 attacks, that plaintiffs lack standing to bring
their civil RICO claim, and that the claims against it present a
nonjusticiable political question.  Al-Haramain Islamic
Foundation (AHIF), Muslim World League (MWL), and Soliman J.
Khudeira (Khudeira) assert that venue has been improperly laid in

---

     [1]  The number of defendants who have been served is unknown,
as plaintiffs have yet to file any proofs of service.  <u>See</u>
Fed.R.Civ.P. 4(l).

the District of Columbia.  MWL moves to dismiss for insufficient
process and insufficient service of process.  All four defendants
challenge this court's personal jurisdiction over them.  And
three of the four assert, in varying ways, that the complaint
fails to state any cause of action against them upon which relief
can be granted.

          This memorandum opinion sets forth my reasons for
concluding: that this Court does have subject matter jurisdiction
of plaintiffs' claims; that this Court has personal jurisdiction
of MWL, Khudeira, and AHIF; that personal jurisdiction of Al
Rajhi is uncertain, and plaintiffs may take limited
jurisdictional discovery with respect to that party; that venue
is properly laid in the District of Columbia; that plaintiffs'
civil RICO claims must be dismissed for want of standing; that
the complaint adequately states ATA, ATCA, and common law
intentional tort claims against AHIF; that plaintiffs' negligence
and negligent infliction of emotional distress claims against
AHIF must be dismissed for failure to state a claim; and that Al
Rajhi and Khudeira may move for more definite statements of
plaintiffs' claims against them before they will be required to
answer the complaint or respond to discovery.

## SUBJECT MATTER JURISDICTION

Plaintiffs invoke the jurisdiction of this court under the ATA for the claims of the plaintiffs who are United States nationals and the ATCA for the claims of those 198 plaintiffs who are foreign nationals. Subject matter jurisdiction is challenged only by Al Rajhi, which argues that the Air Transportation Safety and System Stabilization Act (ATSSSA), Pub. L. No. 107-42, 115 Stat. 230 (Sept. 22, 2001) (reprinted, as amended, at 49 U.S.C.A. § 40101 note (Supp. 2003)), vests exclusive jurisdiction over the claims of these plaintiffs in the United States District Court for the Southern District of New York.

The ATSSSA was enacted by Congress eleven days after the September 11 terrorist attacks "[t]o preserve the continued viability of the United States air transportation system," Pub. L. No. 107-42, 115 Stat. 230, 230, and "to provide compensation to any individual (or relatives of a deceased individual) who was physically injured or killed as a result of the terrorist-related aircraft crashes of September 11, 2001." ATSSSA § 403. The Act is organized into six titles: Title I, Airline Stabilization; Title II, Domestic Insurance and Reimbursement of Insurance Costs; Title III, Tax Provisions; Title IV, Victim Compensation; Title V, Air Transportation Safety; and Title VI, Separability. The purpose of Title IV, which established the September 11th Victim Compensation Fund, see ATSSSA §§ 404-407, was to "protect

the airline industry and other potentially liable entities from
financially fatal liabilities while ensuring that those injured
or killed in the terrorist attacks receive adequate
compensation." Canada Life Assurance Co. v. Converium
Ruckversicherung (Deutschland) AG, -- F.3d --, No. 02-7590, 2003
WL 21524845, at *2 (2d Cir. July 8, 2003) (citation omitted).

Al Rajhi's motion focuses on Section 408, which is
found within Title IV.  Before its amendment in November 2001,
that section was entitled "Limitation on Air Carrier Liability."
It now reads, in pertinent part:

> Sec. 408.  Limitation on liability.
> (a) In general.--(1) Liability limited to insurance
> coverage.--Notwithstanding any other provision of law,
> liability for all claims, whether for compensatory or
> punitive damages or for contribution or indemnity,
> arising from the terrorist-related aircraft crashes of
> September 11, 2001, against an air carrier, aircraft
> manufacturer, airport sponsor, or person with a
> property interest in the World Trade Center, on
> September 11, 2001, whether fee simple, leasehold or
> easement, direct or indirect, or their directors,
> officers, employees, or agents, shall not be in an
> amount greater than the limits of liability insurance
> coverage maintained by that air carrier, aircraft
> manufacturer, airport sponsor, or person.
>
> . . .
>
> (b) Federal cause of action.--
> (1) Availability of action.--There shall exist a
> Federal cause of action for damages arising out of the
> hijacking and subsequent crashes of American Airlines
> flights 11 and 77, and United Airlines flights 93 and
> 175, on September 11, 2001. Notwithstanding section
> 40120(c) of title 49, United States Code [49 U.S.C.A.
> § 40120(c)], this cause of action shall be the
> exclusive remedy for damages arising out of the
> hijacking and subsequent crashes of such flights.

(2) Substantive law.--The substantive law for decision in any such suit shall be derived from the law, including choice of law principles, of the State in which the crash occurred unless such law is inconsistent with or preempted by Federal law.
(3) <u>Jurisdiction.--The United States District Court for the Southern District of New York shall have original and exclusive jurisdiction over all actions brought for any claim (including any claim for loss of property, personal injury, or death) resulting from or relating to the terrorist-related aircraft crashes of September 11, 2001.</u>

(c) Exclusion.--Nothing in this section shall in any way limit any liability of any person who is a knowing participant in any conspiracy to hijack any aircraft or commit any terrorist act. Subsections (a) and (b) do not apply to civil actions to recover collateral source obligations.

ATSSSA § 408 (emphasis supplied).

A court presented with a dispute about the meaning of a statute must first look at the language.  If the language has a "plain and unambiguous meaning," the court's inquiry ends -- "so long as the resulting statutory scheme is coherent and consistent.  Whether statutory language is plain depends on the language itself, the specific context in which the language is used, and the broader context of the statute as a whole." <u>United States v. Barnes</u>, 295 F.3d 1354, 1359 (D.C. Cir. 2002) (quoting <u>United States v. Wilson</u>, 290 F.3d 347, 352 (D.C. Cir. 2002) (quoting <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 340 (1997))). It is the entire statute that must be reviewed, however, and not specific clauses or provisions in isolation.  <u>See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach</u>, 523 U.S. 26, 36 (1998) (a

- 6 -

"central tenet of interpretation [is] that a statute is to be considered in all its parts when construing any one of them"); United States Nat'l Bank of Or. v. Indep. Ins. Agents of America, Inc., 508 U.S. 439, 455 (1993) ("[W]e have stressed that in expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy") (internal quotation and citations omitted).  If the language of the statute is ambiguous, then the court should "look to 'the intent of Congress as revealed in the history and purposes of the statutory scheme.'" Penn Allegh Coal Co., Inc. v. Holland, 183 F.3d 860, 864 (D.C. Cir. 1999) (quoting Adams Fruit Co. v. Barrett, 494 U.S. 638, 642 (1990)).

Read in isolation, § 408(b)(3) is unambiguous and appears to require that plaintiffs' claims be heard in the Southern District of New York.  When the statute is "considered in all its parts," however, the picture is less clear. Considering the "specific context in which the language is used," Barnes, 295 F.3d at 1359, it is arguable that § 408(b)(3)'s "exclusive jurisdiction" provision applies only to the federal cause of action created by § 408(b)(1), and one district court has so construed it.  See Goodrich Corp. v. Winterthur Int'l Am. Ins. Co., No. 02CV367, 2002 WL 31833646, at *4 (N.D. Ohio June 17, 2002); see also In re World Trade Ctr. Disaster Site

- 7 -

Litig., -- F. Supp. 2d --, 2003 WL 21419613, at *3 (S.D.N.Y.
June 20, 2003) ("Section 408(b)(1) of Title IV provides for a
federal cause of action . . . .  Section 408(b)(3) provides that
such actions are to be brought in the United States District
Court for the Southern District of New York") (emphasis
supplied).

      Ambiguity requires that we turn to legislative history,
but in this case the legislative history is meager.[2]  There is no

_____

[2]  The inventory of statements dealing directly with
§ 408(b)(3)'s "exclusive jurisdiction" provision gives new
meaning to the word "meager."  Senator Schumer, without specific
reference to lawsuits against terrorist conspirators, said only,
"[t]he intent here is to put all civil suits arising from the
tragic events of September 11 in the Southern District."  147
Cong. Rec. S9592 (Sept. 21, 2002).  Statements by Senators Hatch
and McCain are no less ambiguous than the statute itself.  See
147 Cong. Rec. S9595 (statement of Senator Hatch) ("For those who
seek to pursue the litigation route, I am pleased that we
consolidated the causes of action in one Federal court so that
there will be some consistency in the judgments awarded.
However, because the pool of funds available to potential
plaintiffs will be limited, we need to eliminate, or at least
limit, the punitive damages that can be awarded"); 147 Cong. Rec.
S9594 (statement of Senator McCain).
      Some courts, including the Second Circuit, have been able
to extract from these snippets certain goals that Congress "must"
have envisioned in including Section 408(b)(3) in the statute.
See Canada Life Assurance Co., -- F.2d at --, 2003 WL 21524845,
at *6 (goals of jurisdictional provision "must [be] the avoidance
of the undesirable effects that litigation of September 11 claims
in the various state and federal courts would inevitably produce.
These effects might [!] include: inconsistent or varying
adjudications of actions based on the same sets of facts;
adjudications having a preclusive effect on non-parties or
substantially impairing or impeding nonparties' abilities to
protect their rights; victims or their survivors without any
possibility of recovery when the limits of liability have been
exhausted in other lawsuits; the difficulties in mediation when
defendants are sued in multiple state and federal courts, and the

Senate or House Report.  It is easy to discern, from the hurried enactment of the statute and from comments made on the floors of the House and the Senate, that the driving force behind ATSSSA was Congress's concern for the financial survival of the airline industry.  <u>See</u> 147 Cong. Rec. S9589-9603 (Sept. 21, 2001); 147 Cong. Rec. H5894-5918 (Sept. 21, 2001).  One court has found that Congress included Title IV in the ATSSSA "intend[ing] that [it] would promote the efficiency and rationality of litigation for those victims who chose to sue rather than to file a claim with the Victim Compensation Fund, and would limit the aggregate exposure of the non-terrorist defendants . . . ."  <u>In re World Trade Ctr. Disaster Site Litig.</u>, -- F. Supp. 2d at --, 2003 WL 21419613, at *10.[3]  Whatever the impetus for the enactment of

---

waste of private and judicial resources in multiple state and federal courts hearing cases involving the same factual and legal issues"); <u>see also</u> <u>Goodrich</u>, 2002 WL 31833646, at *4 n.4 ("By capping the total liability for all claims made against the airline industry, Congress delineated a finite amount of money available for recovery.  To ensure that victims who opt for litigation under the Act receive a just distribution from that finite pool of money, Congress required that litigation seeking recovery from this pool be heard in the Southern District of New York").

[3]  Several cases contain dicta to the effect that victims of the attacks must bring suit on their tort claims in the Southern District of New York, but none of them dealt with the implications of Section 408 on cases against terrorist conspirators.  <u>See</u> <u>Royal Ins. Co. of America v. Tower Records, Inc.</u>, No. 02-Civ. 2612, 2002 WL 31385815, at *9 (S.D.N.Y. Oct. 22, 2002); <u>Graybill v. City of New York</u>, 247 F. Supp. 2d 345, 351 (S.D.N.Y. 2002); <u>Int'l Fine Art & Antique Dealers Show Ltd. v. ASU Int'l, Inc.</u>, No. 02 CIV 534, 2002 WL 1349733, at *5 (S.D.N.Y. June 20, 2002); <u>Goodrich</u>, 2002 WL 31833646, at *5.  As an

ATSSSA, however, the sum total of what passes for its
"legislative history" does not definitively resolve any ambiguity
that emerges from the context of Section 408(b)(3).

Instead what compels my decision to deny Al Rajhi's
motion to dismiss for lack of subject matter jurisdiction is
another canon of statutory construction: that "when two statutes
are capable of co-existence, it is the duty of the courts, absent
a clearly expressed congressional intention to the contrary, to
regard each as effective."  Morton v. Mancari, 417 U.S. 535, 551
(1974); Detweiler v. Pena, 38 F.3d 591, 594 (D.C. Cir. 1994).
The ATA, which is invoked in Count Three of the 3AC, states that
"[a]ny national of the United States injured in his or her
person, property, or business by reason of an act of
international terrorism, or his or her estate, survivors, or
heirs, may sue therefor in any appropriate district court of the
United States," 18 U.S.C. § 2333.  It further provides that suit
may be brought "in the district court of the United States for

_____

example, the court in Graybill stated that "the few relevant
comments show that Congress intended, by consolidating all
September 11 suits in one federal court district, to promote
efficiency and to protect non-airline defendants against
inconsistent and disproportionate results."  247 F. Supp. 2d at
351 (emphasis supplied) (citations omitted).  If the court
intended the term "non-airline defendants" to include terrorists
and their conspirators, it had no support in the statute.
Congress expressly removed any limitation on the liability of
those persons and evinced no desire to protect them from
"disproportionate results."

any district where any plaintiff resides or where any defendant
resides or is served, or has an agent."  18 U.S.C. § 2334.

        Construing the ATSSSA's exclusive jurisdiction language
to encompass claims against the September 11 terrorists and their
conspirators would bring the ATSSSA irreconcilably into conflict
with the ATA.  Congress did not "clearly express" an intention
that Section 408(b)(3) was to render the ATA's jurisdictional
provision ineffective, although it is "normally expected to be
aware of its previous enactments and to provide clear statement
of repeal if it intends to do so."  Navegar, Inc. v. United
States, 192 F.3d 1050, 1063 n.8 (D.C. Cir. 1999) (citing Samuels
v. District of Columbia, 770 F.2d 184, 194 n. 7 (D.C. Cir. 1985)
(citing TVA v. Hill, 437 U.S. 153, 189-93 (1978))), cert. denied,
531 U.S. 816 (2000).  Indeed, Congress was careful to acknowledge
another potentially conflicting statute when it enacted Section
408(b), making the new cause of action it had created an
exclusive remedy "[n]otwithstanding section 40120(c) of title
49 . . . ."[4]

        There is no conflict between the ATSSSA and the ATA if
both statutes are given effect.  That is accomplished here by
giving a narrow construction to the "exclusive jurisdiction"
language of Section 408(b)(3).  See Hudson News Co. v. Fed. Ins.

---

        [4] Authorizing the President to extend the application of
the Federal Aviation Act to areas outside the United States, see
49 U.S.C. § 40120.

Co., 258 F. Supp. 2d 382, 387-88 (D.N.J. 2003) ("[M]ost, if not
all courts addressing the jurisdictional effect of the Air Safety
Act have narrowly construed the scope of § 408(b)(1) and (3) . .
. . [T]his Court is, like its sister courts, reluctant to
attribute expansive effect to those provisions") (internal
citations omitted).

## PERSONAL JURISDICTION

The venue provision of the ATA provides that:

> [a]ny civil action under section 2333 of this title
> against any person may be instituted in the district
> court of the United States for any district where any
> plaintiff resides or where any defendant resides or is
> served, or has an agent.  Process in such a civil
> action may be served in any district where the
> defendant resides, is found, or has an agent.

18 U.S.C. § 2334(a).  Because the statute provides for nationwide
service of process, the relevant Due Process inquiry for personal
jurisdiction purposes, assuming that the defendant has been
properly served, "is whether the defendant has had minimum
contacts with the United States."  Busch v. Buchman, Buchman &
O'Brien, Law Firm, 11 F.3d 1255, 1258 (5th Cir. 1994) (citations
omitted); see, e.g., SEC v. Carrillo, 115 F.3d 1540, 1543 (11th
Cir. 1997); Estates of Ungar ex rel. Strachman v. Palestinian
Auth., 153 F. Supp. 2d 76, 88 (D.R.I. 2001) (personal
jurisdiction proper in ATA case when defendants have minimum
contacts with United States as a whole, and have been served in

any district where they reside, are found, or have an agent);
Combs v. Adkins & Adkins Coal Co., 597 F. Supp. 122, 125 (D.D.C.
1984).[5]

AHIF does not deny its contacts with the United States
(it is an Oregon corporation, doing business in that state), nor
does it challenge the sufficiency of service upon it.  Its sole
argument against personal jurisdiction is derivative of its Rule
12(b)(6) motion to dismiss for failure to state an ATA claim.
Since that motion is denied, see infra, the motion to dismiss for
want of personal jurisdiction is also denied.

MWL moves under Rules 12(b)(4), (5) and (2), asserting
insufficient process, insufficient service of process, and lack
of personal jurisdiction, arguing that it lacks the requisite

_____

[5]  Several cases have held that, in cases of nationwide
service of process, minimum contacts with the United States may
not be the stopping point of the inquiry; rather, the traditional
requirement that the assertion of personal jurisdiction "comport
with 'fair play and substantial justice,'" Burger King Corp. v.
Rudzewicz, 471 U.S. 462, 476 (1985) (quoting Int'l Shoe Co. v.
Washington, 326 U.S. 310, 320 (1945)), applies in such cases.
See Peay v. Bellsouth Med. Assistance Plan, 205 F.3d 1206, 1212
(10th Cir. 2000); Republic of Panama v. BCCI Holdings
(Luxembourg) S.A., 119 F.3d 935, 947 (11th Cir. 1997).  Thus, in
the "rare" cases where a defendant who has minimum contacts with
the United States nonetheless "will be unduly burdened by the
assertion of jurisdiction in a faraway and inconvenient forum,"
Republic of Panama, 119 F.3d at 947, and this inconvenience
"rise[s] to a level of constitutional concern," id., the
assertion of personal jurisdiction may not satisfy due process.
Such instances, though, are "highly unusual," id., and in any
event require that a defendant make a showing of constitutionally
significant inconvenience of litigating in the chosen forum,
which none of the defendants disputing personal jurisdiction have
attempted to do here.

minimum contacts with the United States to satisfy the
requirements of the Due Process Clause.[6]  Plaintiffs' response is
that MWL has been properly served at its New York offices, and by
service of copies of the summons and complaint on two of its
officers, defendants Hassan A.A. Bahafzallah and Yaqub M. Mirza
(both of whom are named as defendants in their individual
capacities as well).  The question is whether the offices in New
York and Virginia are offices of the defendant MWL, or offices of
a "legally separate and independent entity."  MWL Memorandum of
Points and Authorities in Support of Motion to Dismiss ("MWL
Mem.") at 10.  If MWL maintains branch offices in New York and
Virginia, then it has minimum contacts with the United States.

It is plaintiffs' burden to make a *prima facie* showing
of jurisdiction, but the burden is "only a minimal one."
Jacobsen v. Oliver, 201 F. Supp. 2d 93, 104 (D.D.C. 2002)
(internal quotation omitted).  Close factual disputes concerning
jurisdiction are to be resolved in favor of the plaintiffs.  See
Crane v. N.Y. Zoological Soc'y, 894 F.2d 454, 456 (D.C. Cir.
1990); Jacobsen, 201 F. Supp. 2d at 104.  Plaintiffs have shown

---

[6]  MWL also makes a cursory motion to dismiss on the ground
of forum *non conveniens*.  However, on such a motion, MWL bears
the burden of making the preliminary showing that an adequate
alternative forum exists.  See El-Fadl v. Cent. Bank of Jordan,
75 F.3d 668, 677 (D.C. Cir. 1996).  MWL's vague musings on the
interests of Saudi Arabia in the litigation of this matter do not
establish the courts of that nation as adequate alternative fora.

that MWL's own website identifies the MWL entities in Virginia
and New York as "Offices Abroad" and that it makes no distinction
between those offices and MWL itself, in sharp contrast to its
treatment of other, apparently separate entities, which are
characterized as "Affiliated Centers" and "Bodies of the League."
See Muslim World League website, at
http://www.muslimworldleague.org.  The 3AC also cites the
testimony of an MWL representative, Arafat al-Asahi, that the MWL
has thirty offices worldwide, including in the United States,
3AC at ¶ 250, and several other sources that describe the United
States offices as offices of MWL.  See Plaintiffs' Opposition to
MWL's Motion to Dismiss at 14-15.  In contrast, MWL presents no
evidence whatsoever -- not a single affidavit or article of
incorporation -- to support its conclusory assertion that the
offices in New York and Virginia are legally separate and
independent entities from MWL.  Since factual disputes are to be
resolved in favor of the plaintiffs, and MWL has failed to
proffer any facts in support of its position, I find that
plaintiffs have met their minimal burden of making a *prima facie*
showing of personal jurisdiction as to MWL.[7]

---

[7] MWL's only argument regarding insufficient service of
process, and insufficient process, was that MWL is a distinct
entity from the New York and Virginia offices of MWL, see MWL
Mem. at 17-19.  That argument having been rejected, MWL's Rule
12(b)(4) and (5) motions are denied.

Al Rajhi moves to dismiss for lack of personal jurisdiction, asserting that it is a Saudi bank without substantial contacts with the United States.  In response, plaintiffs point to several facts that purportedly demonstrate Al Rajhi's minimum contacts -- that a wholly-owned subsidiary initiated litigation in Texas, and that Al Rajhi's website informs its customers and potential customers that it provides a banking service to accomplish the quick transfer of funds to relatives here.  Plaintiffs ask to conduct jurisdictional discovery, should the court determine that their facts do not amount to a *prima facie* showing of personal jurisdiction as to Al Rajhi.

"When a defendant asserts that this Court lacks personal jurisdiction, the burden is on the plaintiff to prove that jurisdiction can be exercised." Baltierra v. W.V. Bd. of Med., 253 F. Supp. 2d 9, 13 (D.D.C. 2003) (citing Reuber v. United States, 787 F.2d 599, 599 (D.C. Cir. 1986) (per curiam)). If a plaintiff cannot immediately meet this burden, it is within the court's discretion to allow jurisdictional discovery.  See Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC, 148 F.3d 1080, 1089 (D.C. Cir. 1998).  "[I]f a party demonstrates that it can supplement its jurisdictional allegations through discovery, then jurisdictional discovery is justified." GTE New Media Servs. Inc. v. Bellsouth Corp., 199 F.3d 1343, 1351 (D.C. Cir.

2000) (internal citation omitted); Gorman v. Ameritrade Holding Corp., 293 F.3d 506, 513 (D.C. Cir. 2002).  Plaintiffs' factual showing does not satisfy its jurisdictional burden, but it is enough (barely) to warrant limited jurisdictional discovery.

Khudeira, like AHIF, bases his personal jurisdiction argument on his belief that plaintiffs have failed to state a claim against him under the ATA.  A plaintiff may utilize a statute's nationwide service of process to establish personal jurisdiction, however, if the plaintiff asserts merely a colorable claim under the statute.  See Republic of Panama, 119 F.3d at 941-42; IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1056 (2d Cir. 1993), cert. denied, 513 U.S. 822 (1994).  A jurisdictional motion to dismiss that challenges the assertion of a right created by statute should be granted "only if the right claimed is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise devoid of merit as not to involve a federal controversy.'" Republic of Panama, 119 F.3d at 941 (quoting Herrmann, 9 F.3d at 1055; other citations omitted). Plaintiffs' allegations against Khudeira are infirm, see infra, but they do state a colorable claim under the ATA.

## VENUE

The ATA's special venue provision, 18 U.S.C. § 2334, allows for a suit under that statute to be brought in any

district where any plaintiff resides.  Five of the plaintiffs in this case are District of Columbia residents,[8] so that the District of Columbia is an appropriate venue for the ATA claims of all of the plaintiffs.  "[V]enue must be proper for *each* claim," J.S.G. Boggs v. United States, 987 F. Supp. 11, 17 (D.D.C. 1997) (emphasis in original) (citing Lamont v. Haig, 590 F.2d 1124, 1135 (D.C. Cir. 1978); other citations omitted), but, if venue is proper for the "principal cause of action," the doctrine of pendent venue permits a plaintiff to add other claims for which venue would not individually be proper.  See, e.g., Johnson v. Washington Gas Light Co., 89 F. Supp. 2d 45, 47 (D.D.C. 2000).  The key consideration in the exercise of pendent venue is whether the claims originate from a common nucleus of operative fact, because that test, "in itself, embodies factors that bear upon judicial economy, convenience, and fairness." Beattie v. United States, 756 F.2d 91, 103 (D.C. Cir. 1985), overruled on other grounds, Smith v. United States, 507 U.S. 197 (1993).  Other relevant factors to consider are the existence of common issues of proof and the existence of similar witnesses. See Beattie, 756 F.2d at 103; Boggs, 987 F. Supp. at 17.  Each of these three factors weighs in favor of the exercise of pendent venue over all of the United States nationals' claims.

---

[8]  Kelly C. Josiah (P177); Robin K. Wiener (P369); Stephan J. Gerhardt (P595); Sister Doe #76 (AP166); John Doe #92 (AP195).

Only United States nationals may bring claims under the ATA, 18 U.S.C. § 2333, but the claims of the plaintiffs who are foreign nationals (of whom there are 198, according to counsel, Transcript of June 24, 2003, Hearing ("Tr.") at 83) may also be adjudicated here under the theory of pendent venue.  The Court of Appeals has explained that the "pendent venue" doctrine is closely related to what was once called "pendent jurisdiction," see Beattie, 756 F.2d at 101, now re-labeled "supplemental jurisdiction" and governed by 28 U.S.C. § 1367(a).  Section 1367(a) codified, among other things, the practice of "pendent party" jurisdiction, allowing the joinder of a party even though there is no independent federal question jurisdiction over that party's claims.  See, e.g., Mendoza v. Zirkle Fruit Co., 301 F.3d 1163, 1174 (9th Cir. 2002); Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611, 618 (4th Cir. 2001); see generally Raygor v. Regents of Univ. of Minn., 534 U.S. 533, 539-40 (2002) (noting that by enactment of Section 1367(a), Congress authorized the "exercise [of] pendent jurisdiction over claims involving parties who were not already parties to a claim independently within the court's subject matter jurisdiction").

In this case, the claims of the foreign national plaintiffs are unquestionably so related to those of the other plaintiffs as to form part of the same case or controversy.  That finding would  support the exercise of supplemental jurisdiction

under a "pendent party" theory, if it were necessary to do so, and will also support the recognition of pendent venue, to allow the foreign national plaintiffs to proceed in this court.  The exercise of pendent venue over the foreign nationals' claims also satisfies the relevant factors of a common nucleus of operative fact, common issues of proof and existence of the same witnesses with the other plaintiffs' claims.

## SUFFICIENCY OF PLAINTIFFS' STATEMENT OF CLAIMS

The four motions to dismiss make two kinds of Rule 12(b)(6) arguments.  They argue that plaintiffs' claims brought under the ATCA and RICO will not lie no matter how they are pleaded.  And they argue that the 3AC does not successfully state claims under the ATA and common law theories of intentional tort and negligence as to them.  The latter argument raises difficult questions about the sufficiency of pleading that will be addressed after reviewing the ATCA and RICO questions.

### Alien Tort Claims Act (ATCA)

The ATCA states, in its entirety, that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350. The question of whether the statute creates a separate cause of

action or merely confers subject matter jurisdiction is the
subject of wide, and current, debate, and it remains unsettled in
this Circuit.  See Al Odah v. United States, 321 F.3d 1134, 1146
(D.C. Cir. 2003) (Randolph, J., concurring); Doe v. Islamic
Salvation Front, 257 F. Supp. 2d 115, 120 (D.D.C. 2003).  In Tel-
Oren v. Libyan Arab Republic, 726 F.2d 774 (1984), the Court of
Appeals heard an appeal from the dismissal, for lack of subject
matter jurisdiction, of an ATCA action brought against Arab and
Palestinian organizations by victims of an armed attack on a
civilian bus in Israel.  The panel affirmed the dismissal, but it
issued three divergent opinions to explain its ruling.  Judge
Edwards found that, while the ATCA created a cause of action, it
would not support an award of damages for torture committed by
non-state actors; Judge Bork thought that the ATCA did not grant
a cause of action in the first place; and Judge Robb concluded
that the action presented a nonjusticiable political question.
Tel-Oren, 726 F.2d at 791, 795, 799, 823.

        The great majority of the federal courts outside this
Circuit that have addressed the issue have held that the ATCA
does create a cause of action.  See, e.g., Papa v. United States,
281 F.3d 1004, 1013 (9th Cir. 2002) (citing In re Estate of
Ferdinand Marcos, Human Rights Litig., 25 F.3d 1467, 1474-75 (9th
Cir. 1994)); Abebe-Jira v. Negewo, 72 F.3d 844, 847-48 (11th Cir.
1996); Kadic v. Karadzic, 70 F.3d 232, 241 (2d Cir. 1995);

Iwanowa v. Ford Motor Co., 67 F. Supp. 2d 424, 443 (D.N.J. 1999);
Beanal v. Freeport-McMoran, Inc., 969 F. Supp. 362, 370 (E.D. La.
1997), aff'd, 197 F.3d 161 (5th Cir. 1999); Xuncax v. Gramajo,
886 F. Supp. 162, 179 (D. Mass. 1995); Paul v. Avril, 812 F.
Supp. 207, 212 (S.D. Fla. 1993).  Many of those decisions follow
Judge Edwards's Tel-Oren concurrence, and so will I.

        The elements of a claim under the ATCA are that
"(1) the plaintiff is an alien; (2) the claim is for a tort; and
(3) the tort is committed in violation of the law of nations or a
treaty of the United States." Bao Ge v. Li Peng, 201 F. Supp. 2d
14, 19-20 (D.D.C. 2000) (citations omitted); Doe I v. Islamic
Salvation Front, 993 F. Supp. 3, 7 (D.D.C. 1998); Kadic, 70 F.3d
at 238.  The first two elements are easily met in this case.  As
for the third element, the September 11 attacks began with the
hijacking of four airplanes, and aircraft hijacking is generally
recognized as a violation of international law of the type that
gives rise to individual liability.[9]  See Bigio v. Coca-Cola Co.,

---

        [9]  The ATCA may be applied to certain actions of private,
non-state actors.  In Sanchez-Espinoza v. Reagan, 770 F.2d 202
(D.C. Cir. 1985), indeed, the Court of Appeals stated, in dicta,
that "[t]his obscure section of the Judiciary Act of 1789 . . .
may conceivably have been meant to cover only private,
nongovernmental acts that are contrary to treaty or the law of
nations -- the most prominent examples being piracy and assaults
upon ambassadors."  770 F.2d at 206 (emphasis supplied).  See
also Kadic, 70 F.3d at 239 ("[C]ertain forms of conduct violate
the law of nations whether undertaken by those acting under the
auspices of a state or only as private individuals");
Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F.
Supp. 2d 289, 311 (S.D.N.Y. 2003); Bao Ge, 201 F. Supp. 2d at 22

239 F.3d 440, 447-48 (2d Cir. 2001); <u>Kadic</u>, 70 F.3d at 240; <u>Doe</u>,
257 F. Supp. 2d at 120; <u>Talisman</u>, 244 F. Supp. 2d at 309;
<u>Abdullahi v. Pfizer, Inc.</u>, No. 01CIV8118, 2002 WL 31082956, at *4
(S.D.N.Y. Sept. 17, 2002); <u>see also</u> Restatement (Third) of the
Foreign Relations Law of the United States § 404 (1987) ("A state
has jurisdiction to define and prescribe punishment for certain
offenses recognized by the community of nations as of universal
concern, such as piracy, slave trade, attacks on or hijacking of
aircraft, genocide, war crimes, and perhaps certain acts of
terrorism . . . ."); <u>see generally</u> <u>United States v. Yunis</u>, 924
F.2d 1086, 1092 (D.C. Cir. 1991) ("Aircraft hijacking may well be
one of the few crimes so clearly condemned under the law of
nations that states may assert universal jurisdiction to bring
offenders to justice, even when the state has no territorial
connection to the hijacking and its citizens are not involved")
(internal citations omitted).

　　　Although no defendant in this case is sued as a direct
perpetrator of a tort committed in violation of the law of
nations, proof that they were accomplices, aiders and abetters,
or co-conspirators would support a finding of liability under the
ATCA. <u>See, e.g.</u>, <u>Talisman</u>, 244 F. Supp. 2d at 321 (joining other
courts in holding that "ATCA suits [may] proceed based on

n.5; <u>Iwanowa</u>, 67 F. Supp. 2d at 445; <u>Doe I</u>, 993 F. Supp. at 8 ;
<u>Beanal</u>, 969 F. Supp. at 371; <u>Tel-Oren</u>, 726 F.2d at 795 (Edwards,
J., concurring).

theories of conspiracy and aiding and abetting"); <u>Mehinovic v. Vuckovic</u>, 198 F. Supp. 2d 1322, 1355 (N.D. Ga. 2002) ("United States courts have recognized that principles of accomplice liability apply under the ATCA to those who assist others in the commission of torts that violate customary international law") (citing cases); <u>Eastman Kodak Co. v. Kavlin</u>, 978 F. Supp. 1078, 1091-92 (S.D. Fla. 1997).


**Racketeer Influenced and Corrupt Organizations Act (RICO)**

A civil cause of action will lie under RICO for "[a]ny person injured in his business or property by reason of a violation of section 1962 . . . ." 18 U.S.C. § 1964(c). This language has been construed as conferring standing, without which a plaintiff may not maintain a RICO claim. <u>Sedima, S.P.R.L. v. Imrex Co., Inc.</u>, 473 U.S. 479, 496 (1985). The plaintiffs in this case have alleged personal injuries, and economic losses derived therefrom, but not any specific injuries to business or property that are separate from their personal injuries.

The overwhelming weight of authority discussing the RICO standing issue holds that the "business or property" language of Section 1964(c) does not encompass personal injuries. <u>See, e.g.</u>, <u>Hughes v. Tobacco Inst., Inc.</u>, 278 F.3d 417, 422 (5th Cir. 2001) ("The phrase 'injury to business or property' excludes personal injuries") (internal citation omitted); <u>Hamm v. Rhone-Poulenc Rorer Pharm., Inc.</u>, 187 F.3d 941, 954 (8th Cir. 1999)

(plaintiffs lacked standing because "[d]amage to reputation is generally considered personal injury and thus is not an injury to 'business or property' within the meaning of 18 U.S.C. § 1964(c)") (internal citation omitted); Bast v. Cohen, Dunn & Sinclair, PC, 59 F.3d 492, 495 (4th Cir. 1995) ("An allegation of personal injury and pecuniary losses occurring therefrom are not sufficient to meet the statutory requirement of injury to 'business or property'") (internal citation omitted); Oscar v. Univ. Students Coop. Ass'n, 965 F.2d 783, 785 (9th Cir. 1992) ("[I]t is clear that personal injuries are not compensable under RICO"); Doe v. Roe, 958 F.2d 763, 767 (7th Cir. 1992) ("The terms 'business or property' are, of course, words of limitation which preclude recovery for personal injuries and the pecuniary losses incurred therefrom") (internal citation omitted); Genty v. Resolution Trust Corp., 937 F.2d 899, 918 (3d Cir. 1991) (plaintiffs could not recover damages for personal injuries due to toxic waste exposure under RICO, because those were not damages to business or property); Grogan v. Platt, 835 F.2d 844, 848 (11th Cir. 1988) ("We . . . hold that the appellants cannot recover under RICO for those pecuniary losses that are most properly understood as part of a personal injury claim"); Drake v. B.F. Goodrich Co., 782 F.2d 638, 644 (6th Cir. 1986) (plaintiffs alleging wrongful death and personal injury due to exposure to toxic chemicals did not have standing under § 1964(c) because they had not alleged injury to business or property);

<u>Bankers Trust Co. v. Rhoades</u>, 741 F.2d 511, 515 (2d Cir. 1984)
("[A] person physically injured in a fire whose origin was arson
is not given a right to recover for his personal injuries; damage
to his business or his building is the type of injury for which
§ 1964(c) permits suit") (dictum), <u>vacated on other grounds</u>, 473
U.S. 922 (1985).  Some of the Circuit courts have dealt with
arguments similar to those advanced by plaintiffs here -- that
they have suffered "business or property" injury by reason of
their inability to derive income from their decedents' businesses
or professions -- and have rejected them.  <u>See</u> <u>Doe</u>, 958 F.2d at
770 ("Doe's loss of earnings, her purchase of a security system
and her employment of a new attorney are plainly derivatives of
her emotional distress -- and therefore reflect personal injuries
which are not compensable under RICO") (internal citations
omitted); <u>Grogan</u>, 835 F.2d at 847 (§ 1964(c) does not permit
recovery even though plaintiffs suffered such economic loss as
loss of decedents' earnings).

    The <u>Grogan</u> case is particularly instructive.  In that
case, FBI agents, in pursuit of bank robbers, had exchanged
gunfire with the robbers; six FBI agents were injured and two
died.  The surviving FBI agents and the estates of the two
deceased agents sued the robbers under RICO, as well as for
wrongful death, assault and battery and negligence.  The Eleventh
Circuit, acknowledging that personal injuries have economic
consequences, stated that a court's task is "not to decide

- 26 -

whether the economic aspects of damages resulting directly from personal injuries could, as a theoretical matter, be considered injury to 'business or property,' but rather to determine whether Congress intended the damages that plaintiffs seek in this case to be recoverable under civil RICO." Grogan, 835 F.2d at 846. Considering the language of the RICO statute, the caselaw on the Clayton Act, which contains identical "business or property" language, and the fact that pecuniary damages are inextricably intertwined with non-pecuniary damages in a personal injury action, the Court held that even pecuniary losses that are derivative of personal injuries are not "business or property" injuries under RICO. Id. at 848.

Dicta found in Serv. Employees Int'l Union Health & Welfare Fund v. Philip Morris Inc., 249 F.3d 1068, 1076 (D.C. Cir. 2001) ("Like other circuits, we conclude that individual smokers constitute a group of potential plaintiffs possessed of more direct claims who can be counted on to deter the alleged wrongdoing by asserting state law theories of recovery or perhaps even RICO and federal antitrust claims to the extent they can prove a measure of damages distinct from personal injuries") (emphasis supplied) (internal citations omitted), enable a fairly safe prediction that, when the District of Columbia Circuit Court of Appeals gets around to addressing this issue squarely, its decision will be the same as that of its sister courts.

- 27 -

Plaintiffs point out that "RICO is to 'be liberally construed to effectuate its remedial purposes,'" Sedima, 473 U.S. at 498 (quoting Pub. L. 91-452, § 904(a), 84 Stat. 941, 947), and they urge that a liberal construction of the injury to "business or property" language would allow for economic losses arising from personal injury. See Rice v. Janovich, 742 P.2d 1230, 1237-38, 109 Wash. 2d 48, 60-61 (1987) (where Court, eschewing "narrow interpretation" of 'business or property,' held that claim for wages lost as a result of personal injuries suffered in bombing was compensable under RICO). Even a liberal construction, however, cannot stretch the phrase "injured in his business or property" far enough to include personal injury.[10] Indeed, if a court were to follow plaintiffs' suggestion that that phrase is a phrase of illustration and not limitation, it would come perilously close to rendering that phrase surplusage, and that would be unacceptable. See, e.g., Lin Qi-Zhuo v. Meissner, 70 F.3d 136, 139 (D.C. Cir. 1995) ("An endlessly reiterated principle of statutory construction is that all words in a statute are to be assigned meaning, and that nothing therein is to be construed as surplusage") (citations omitted).

---

[10] In dicta in a Clayton Act case (the Clayton Act contains language that is identical to the "business or property injury" phrase in the civil RICO provision), the Supreme Court has stated that "[t]he phrase 'business or property' also retains restrictive significance. It would, for example, exclude personal injuries suffered." Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979) (citation omitted).

- 28 -

**Fed.R.Civ.P. 8(a)**

In order to succeed on any of their claims as to any defendant (except their claims of negligence, which are dealt with _infra_), plaintiffs will have to establish an appropriate level of knowledge and intent on the part of that defendant and an appropriate causal link between the actions of that defendant and plaintiffs' injuries.  It is too soon to attempt a precise formulation of the level of knowledge and intent or certainty of causation that will be necessary to get plaintiffs' claims to a jury, but the pending motions to dismiss require analysis now of the degree of pleading specificity that is necessary to hold these four defendants to answer the complaint against them.

We begin with the familiar propositions that a motion to dismiss for failure to state a claim under Rule 12(b)(6) will be granted only if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," Conley v. Gibson, 355 U.S. 41, 45-46 (1957); that the complaint will be construed in the light most favorable to the plaintiff, and the plaintiff will have "the benefit of all inferences that can be derived from the facts alleged," Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994) (internal citations omitted); and that, at this stage, the court is not to "assess the truth of what is asserted or determine whether a plaintiff has any evidence to back up what is in the complaint." Browning v. Clinton, 292 F.3d 235, 242

- 29 -

(D.C. Cir. 2002) (internal quotation omitted).  On the other
hand, a court may accept "neither 'inferences drawn by plaintiffs
if such inferences are unsupported by the facts set out in the
complaint,' nor 'legal conclusions cast in the form of factual
allegations.'"  Id. (quoting Kowal, 16 F.3d at 1275).

　　　　Rule 8(a)(2) requires only that a complaint contain "a
short and plain statement of the claim showing that the pleader
is entitled to relief . . . ."  A complaint meeting that bare
minimum requirement may not be dismissed as long as no heightened
pleading standard is required (as in fraud cases, see Rule 9(b)).
In Sparrow v. United Air Lines, Inc., 216 F.3d 1111 (D.C. Cir.
2000), the Court of Appeals held that a Title VII plaintiff does
not need to make out a *prima facie* case of discrimination in his
complaint, observing that "[b]ecause racial discrimination in
employment is 'a claim upon which relief can be granted . . . .
'I was turned down for a job because of my race' is all a
complaint has to say to survive a motion to dismiss under Rule
12(b)(6)."  216 F.3d at 1115 (internal quotation and citations
omitted).  The Supreme Court reached a similar conclusion in
Swierkiewicz v. Sorema N.A., 534 U.S. 506, 515 (2002), also a
Title VII case, observing that the "short and plain statement"
required by Rule 8(a)(2) "must simply 'give the defendant fair
notice of what the plaintiff's claim is and the grounds upon
which it rests,'" id. at 512 (quoting Conley, 355 U.S. at 47),

and that "Rule 8(a)'s simplified pleading standard applies to all
civil actions, with limited exceptions." Id. at 513.

There is no reason to think that the simplified rules
of pleading reinforced by Sparrow and Swierkiewicz do not apply
to an intentional tort case (a violation of Title VII, indeed, is
an intentional tort). See Browning, 292 F.3d at 243 (in claim
for tortious interference with prospective business opportunity,
complaint's "extremely general" allegation was sufficient to
"give[] 'fair notice of what [Browning's] claim is and the
grounds upon which it rests'") (quoting Swierkiewicz, 534 U.S. at
512). On the other hand, it is difficult to imagine uglier or
more serious charges than those the plaintiffs have leveled at
these defendants. The use of the privileged medium of a lawsuit
to  publicly label someone an accomplice of terrorists can cause
incalculable reputational damage. Placing that person in a
situation in which he must retain counsel and defend himself has
dramatic economic consequences as well. It is worth recalling
that one of the reasons for Rule 9(b)'s heightened pleading
standard in fraud cases was "the desire to protect defendants
from the harm that comes to their reputations or to their
goodwill when they are charged with serious wrongdoing . . . ."
Ross v. A.H. Robins Co., Inc., 607 F.2d 545, 557 (2d Cir. 1979)
(quotation omitted), cert. denied, 446 U.S. 946 (1980); see,
e.g., Christopher M. Fairman, Heightened Pleading, 81 Tex. L.
Rev. 551, 563 (2002). No heightened standard of pleading will be

- 31 -

applied in this case, but, given the extreme nature of the charge
of terrorism, fairness requires extra-careful scrutiny of
plaintiffs' allegations as to any particular defendant, to ensure
that he -- or it -- does indeed have fair notice of what the
plaintiffs' claim is and the grounds upon which it rests, and
that no inferences are accepted that are unsupported by the facts
set out in the 3AC.

### Al-Haramain Islamic Foundation (AHIF)

The 3AC alleges that AHIF -- the Oregon corporation --
is part of a much larger organization, Al-Haramain Islamic
Foundation, Incorporated (Al-Haramain), a private charitable
organization founded in 1992 that has a "vast network of offices
and representatives" around the world, 3AC at ¶ 154; that even
though these "branch" offices are usually separately incorporated
in whichever country they are located, they are controlled by Al-
Haramain's Saudi Arabian headquarters, 3AC at ¶ 155; that the
Secretary General and Deputy General of Al-Haramain are,
respectively, the President and Vice-President of AHIF, id.; and,
indeed that AHIF is "one and the same" as Al-Haramain in Riyadh,
Saudi Arabia, 3AC at ¶ 173.[11]

---

[11] AHIF fervently disputes the allegation that it is one and
the same as Al-Haramain.  That dispute, however, is a factual
one, to be sorted out in discovery, and with a motion for summary
judgment, but not on a motion to dismiss under Rule 12(b)(6).  At
this stage, the court must accept plaintiffs' factual allegations
as true.  See, e.g., Taylor v. FDIC, 132 F.3d 753, 762 (D.C. Cir.
1997).

Plaintiffs allege that, in 2001, the "Saudi-based al-Haramain aided al Qaeda terrorist groups in Chechnya and elsewhere by providing them with recruits, weapons and money," 3AC at ¶ 169; that senior al Qaeda operatives worked for Al-Haramain, 3AC at ¶ 171; and that Al-Haramain, through its officers in Saudi Arabia, is a financier of al Qaeda's terrorist activities in Indonesia, 3AC at ¶¶ 176-78. Plaintiffs allege that Al-Haramain offices in Bosnia and Somalia have been designated terrorist entities by the United States Department of State, 3AC at ¶ 155; that they "receive their funding and guidance from the al-Haramain headquarters in Riyadh, Saudi Arabia," 3AC at ¶ 162; and that they provided funding to al Qaeda and Osama bin Laden, 3AC at ¶¶ 161, 164.

These allegations of Al-Haramain's relationships with al Qaeda are more than sufficient to permit the inference that Al-Haramain -- and therefore AHIF, since it is alleged to be "one and the same" as the Saudi Arabian headquarters -- provided material support to al Qaeda with knowledge of, and the intent to further, al Qaeda's terrorist activities. Moving from that point to finding a sufficient causal link between that material support and the injuries suffered by these plaintiffs will presumably require resort to the theories of conspiracy, see infra, or aiding and abetting, the standards for which were enunciated by Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983): "(1) the party whom the defendant aids must perform a wrongful act that

- 33 -

causes an injury; (2) the defendant must be generally aware of

his role as part of an overall illegal or tortious activity at

the time that he provides the assistance; (3) the defendant must

knowingly and substantially assist the principal violation." Id.

at 477 (citations omitted).[12]  The court also stated that a "joint

venturer's" liability extends to all reasonably foreseeable acts

done in connection with the tortious act that the person

assisted.  Id. at 484.

It is properly alleged that al Qaeda committed a

wrongful act that caused injury to the plaintiffs[13] and that Al-

Haramain knowingly financed al Qaeda "in the furtherance of

international terrorism," 3AC at ¶ 155, in the year 2001, 3AC at

¶ 169, a temporal allegation that does not prove but provides

some support for an inference that Al-Haramain's money helped pay

for the September 11 terrorist attacks in the United States.

The 3AC also provides AHIF with sufficient notice of

the conspiracy claims against it.  The elements of civil

---

[12]  As aiding and abetting cases often turn on how
substantial the assistance provided was, the court relied on the
Restatement (Second) of Torts § 876, comment d, for five factors
relevant to making that determination: "the nature of the act
encouraged, the amount of assistance given by the defendant, his
presence or absence at the time of the tort, his relation to the
other [tortfeasor] and his state of mind." Id. at 478.  The
Court also noted a sixth factor of some importance, the duration
of the assistance provided.  Id. at 484.

[13]  The plaintiffs -- and, at this point, the Court -- treat
this allegation as a well-established and notorious fact, but
whether it can be so treated in later stages of this case, by
judicial notice or otherwise, is questionable.

conspiracy are "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." Halberstam, 705 F.2d at 477 (citation omitted). A conspirator may be liable for an injury even if he or she did not plan or know about the particular overt act that caused the injury, "so long as the purpose of the act was to advance the overall object of the conspiracy," id. at 487. Again, plaintiffs' allegations about Al Haramain's financing of al Qaeda's terrorist activities support an inference that there was an agreement concerning the commission of terrorist acts (with Al Haramain as financier and al Qaeda as perpetrator), and that the September 11 attacks were acts done in furtherance of the scheme.

The 3AC's allegations provide support for an inference of a causal link between AHIF's funding and the attacks of September 11. Proximate cause is defined as "a test of whether the injury is the natural and probable consequence of the negligent or wrongful act and ought to be foreseen in light of the circumstances." Murphy v. United States, 653 F.2d 637, 648 n.48 (D.C. Cir. 1981) (quoting Spar v. Obwoya, 369 A.2d 173, 178 (D.C. 1977)). Any terrorist act, including the September 11 attacks, might have been the natural and probable consequence of

- 35 -

knowingly and intentionally providing financial support to al
Qaeda, given the 3AC's allegations that, prior to September 11,
al Qaeda and Osama bin Laden had proclaimed their intentions to
commit murderous terrorist activities against the United States
and its citizens, 3AC at p. 213, and had accompanied these words
with actions by implementing, and publicly acknowledging
responsibility for, such terrorist schemes as the 1993 bombing of
the World Trade Center, the 1998 attack of U.S. embassies in
Kenya and Tanzania, and the 2000 attack of the U.S.S. Cole in
Yemen.  3AC at pp. 212-13.

      Liability for aiding and abetting, or for conspiracy,
must be tied to a substantive cause of action -- in AHIF's case,
the ATA, the ATCA, and a number of common law torts.  The ATA
creates a cause of action for United States nationals injured in
their person, property or business by reason of "act[s] of
international terrorism," a defined term meaning activities that

> involve violent acts or acts dangerous to human life
> that are a violation of the criminal laws of the United
> States or of any State, or that would be a criminal
> violation if committed within the jurisdiction of the
> United States or of any State; (B) appear to be
> intended-- (i) to intimidate or coerce a civilian
> population; (ii) to influence the policy of a
> government by intimidation or coercion; or (iii) to
> affect the conduct of a government by mass destruction,
> assassination, or kidnaping; and (C) occur primarily
> outside the territorial jurisdiction of the United
> States, or transcend national boundaries in terms of
> the means by which they are accomplished, the persons
> they appear intended to intimidate or coerce, or the
> locale in which their perpetrators operate or seek
> asylum.

18 U.S.C. § 2331(1).  AHIF does not assert -- none of these four
defendants asserts -- that the terrorist attacks of September 11,
2001, were not acts of international terrorism.  AHIF does assert
that the allegations of the 3AC "fail to create an inference that
AHIF's acts were the proximate cause of plaintiffs' injuries, or
that AHIF intentionally committed the alleged offenses," AHIF
Motion to Dismiss, at 1-2.

        The seminal case analyzing the ATA is <u>Boim v. Quranic
Literacy Inst. & Holy Land Found. for Relief and Dev.</u>, 291 F.3d
1000 (7th Cir. 2002).  In <u>Boim</u>, plaintiffs -- the parents of a
student murdered by the Palestinian militant group Hamas --
alleged that the defendant organizations were fronts for Hamas in
the United States whose <i>raison d'être</i> was to raise money and
funnel it to Hamas operatives to support their terrorist
activities.  <u>See</u> 291 F.3d at 1003.  Defendants moved to dismiss,
arguing that they could not be sued under the statute for funding
terrorist activities.  The district court denied the motion, and
the Seventh Circuit affirmed, holding that the funding of
terrorist activities is actionable under the ATA.  The court
found that the term "international terrorism" encompasses the
funding of terrorist activities, as Congress, in enacting the
statute, intended "to allow a plaintiff to recover from anyone
along the causal chain of terrorism."  <u>Id.</u> at 1011.  It is not
funding by itself that constitutes international terrorism, the
court observed, but funding provided with knowledge of and intent

- 37 -

to further violent acts, which must be a reasonably foreseeable result of the funding.  Id. at 1011-12.  Liability can be established by proving violations of the criminal counterparts of Section 2333, 18 U.S.C. § 2339A[14] or § 2339B,[15] or, the Seventh

---

[14]  Section 2339A reads, in pertinent part:

(a) Offense.--Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 229, 351, 831, 842(m) or (n), 844(f) or (i), 930(c), 956, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 1993, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, or 2340A of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), or section 46502 or 60123(b) of title 49, or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both . . . .

(b) Definition.--In this section, the term "material support or resources" means currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials.

[15]  Section 2339B(a)(1) reads:

Unlawful conduct.--Whoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life.

- 38 -

Circuit held, by resort to traditional aiding and abetting

theory, id. at 1021.  In Boim, the plaintiffs had alleged that

> [defendants] HLF and QLI supplied money to Hamas to
> fund terrorist operations, that they are "front"
> organizations with ostensibly legitimate purposes which
> are actually engaged in fund-raising and money
> laundering in support of terrorist activities. They
> have alleged that HLF and QLI provided the money to
> purchase the weapons and train the men who killed David
> Boim.

Id. at 1023-24.  The court found that these allegations were

sufficient to state a claim under the aiding and abetting theory

and that they gave defendants fair notice of what plaintiffs'

claim was and the grounds upon which it rested, id. at 1024.

The court observed that plaintiffs would eventually have to

"prove that the defendants knew of Hamas' illegal activities,

that they desired to help those activities succeed, and they

engaged in some act of helping the illegal activities," id. at

1023, but it noted that

> we will not dismiss a complaint before discovery unless
> it appears beyond doubt that the Boims can prove no set
> of facts in support of their claim which would entitle
> them to relief.  Although the defendants claim to have
> been supporting only the humanitarian mission of Hamas,
> that is a fact question that cannot be resolved at this
> early stage of the litigation.

Id. at 1025 (internal citation omitted).  It must be acknowledged

that the complaint in Boim was quite specific in its allegation

of a causal link: it alleged that the funds provided by

defendants were used by the terrorists in committing the murder

of Boim -- that, indeed, the specific instruments used to

perpetrate the murder, including the guns and ammunition, had been purchased with defendants' money.  There is no such specific allegation in the 3AC.  In light of <u>Sparrow</u> and <u>Swierkiewicz</u>, however, such specificity cannot be required at the pleading stage.

Given the adequacy of plaintiffs' allegations that AHIF aided and abetted and conspired with the September 11 hijackers, plaintiffs have also stated common law claims for wrongful death, survival, and intentional infliction of emotional distress.[16] There can be little question that plaintiffs have stated claims under N.Y. Est. Powers & Trusts Law § 5-4.1(1) (McKinney 2002) (wrongful death) and N.Y. Est. Powers & Trusts Law § 11-3.2(b) (McKinney 2002) (survival), and the terrorist acts of September 11 would appear to be a perfect fit for the elements of intentional infliction of emotional distress: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a

---

[16]  The issue of what law will apply to plaintiffs' common law claims has not been briefed in this round of motions, nor was it discussed more than cursorily at oral argument, where movants stated that they did not feel that any differences between New York law and the laws of Virginia and Pennsylvania bear on these motions to dismiss, Tr. at 44.  The following discussion refers to New York law, which seems most likely applicable to the great majority of the claims presented here.  <u>See</u> <u>Tramontana v. S.A. Empresa de Viacao Aerea Rio Grandese</u>, 350 F.2d 468, 472-73 (D.C. Cir. 1965), <u>cert. denied</u>, 383 U.S. 943 (1966); <u>Herbert v. District of Columbia</u>, 808 A.2d 776, 779-80 (D.C. 2002).  The denial of defendant's motions as to the common law claims is without prejudice to the renewal of those motions if significant choice of law questions arise that might dictate a different outcome.

substantial probability of causing, severe emotional distress;
(iii) a causal connection between the conduct and injury; and
(iv) severe emotional distress." Howell v. N.Y. Post Co., Inc.,
81 N.Y.2d 115, 121, 612 N.E.2d 699, 702, 596 N.Y.S.2d 350, 353
(1993). The outrageous and extreme conduct must generally be
directed at the plaintiff, Martin v. Citibank, N.A., 762 F.2d
212, 220 (2d Cir. 1985), but a cause of action may also be stated
when the conduct "causes injury to a third person, thereby
intentionally or recklessly causing severe emotional distress to
a member of such person's [immediate] family who is present at
the time." Maney v. Maloney, 101 A.D.2d 403, 405-06, 477
N.Y.S.2d 436, 438 (3d Dep't App. Div. 1984) (citing Restatement
(Second) of Torts § 46(2)(a)). A terrorist attack on civilians
is of course intended to cause emotional distress to the victims'
families. Cf. Jenco v. Islamic Republic of Iran, 154 F. Supp. 2d
27, 35 (D.D.C. 2001) ("'[W]hen an organization takes someone
hostage, it is implicitly intending to cause emotional distress
among the members of that hostage's immediate family'") (quoting
Sutherland v. Islamic Republic of Iran, 151 F. Supp. 2d 27, 50
(D.D.C. 2001)), aff'd, 315 F.3d 325 (D.C. Cir. 2003). Family
members here were not physically present at the World Trade
Center, or at the Pentagon, or at Shanksville, but the whole
world was virtually present, and that is enough. See Acree v.
Republic of Iraq, -- F. Supp. 2d --, No. 02-632, 2003 WL
21537919, at *37 (D.D.C. July 7, 2003) (presentation of battered

POWs on television by their captors and public threats to use
POWs as human shields made POWs' family members contemporaneously
aware that victims were probably being tortured, thus satisfying
"presence" requirement); Jenco, 154 F. Supp. 2d at 36 ("'If the
defendants' conduct is sufficiently outrageous and intended to
inflict severe emotional harm upon a person which is not present,
no essential reason of logic or policy prevents liability'")
(quoting Dan B. Dobbs, The Law of Torts § 307, at 834 (2000)).[17]

        Plaintiffs' negligence claims must be dismissed for
failure to state a claim upon which relief can be granted.  The
3AC neither alleges nor identifies a duty that AHIF owed to these
plaintiffs, if it had no knowledge that funds it was disbursing
were making their way into the coffers of al Qaeda.  See Steed
Fin. LDC v. Laser Advisers, Inc., 258 F. Supp. 2d 272, 284
(S.D.N.Y. 2003) (dismissing negligence claim made under New York
law because plaintiffs had failed to allege that defendants owed
them any duty); Kolbeck v. LIT America, Inc., 923 F. Supp. 557,
571 (S.D.N.Y. 1996) (dismissing negligence claim made under New
York law because plaintiffs "failed to plead a basic element of a
negligence claim -- the existence of a duty of care"); see
generally Pulka v. Edelman, 40 N.Y.2d 781, 782, 358 N.E.2d 1019,

---

[17]   Those plaintiffs who are not immediate family members of
the victims may not maintain a claim for intentional infliction
of emotional distress, see Bettis v. Islamic Republic of Iran,
315 F.3d 325, 333 (D.C. Cir. 2003), but those plaintiffs need not
be individually excised from this claim at this stage.

1020, 390 N.Y.S.2d 393, 394 (1976) ("[B]efore a defendant may be held liable for negligence it must be shown that the defendant owes a duty to the plaintiff") (citation omitted).  Plaintiffs have thus failed to state claims for negligence or for negligent infliction of emotional distress.  See Mortise v. United States, 102 F.3d 693, 696 (2d Cir. 1996) (breach of duty is an essential element to negligent infliction of emotional distress under both New York's "bystander" and "direct duty" theories).

Plaintiffs, in their opposition to AHIF's motion to dismiss, appeared to invoke the doctrine of negligence *per se*, arguing that AHIF's "failure to identify or track charitable funds being used to promote and finance terrorist activities constitutes a breach of its duty of care and obligations," Plaintiffs' Opposition Memorandum at 48, presumably under some laws and regulations governing charities.  Plaintiffs' failure to identify those laws and regulations dooms this argument.  See Riggs v. Schappell, 939 F. Supp. 321, 332 n.15 (D.N.J. 1996) ("[P]laintiffs argue that a duty may be imposed . . . on the basis of a violation of industry custom or practice.  However, as plaintiffs have directed this court to no industry custom or practice defendants . . . are alleged to have violated, this argument must be rejected").

Muslim World League (MWL)

The MWL does not move to dismiss for failure to state a claim, but instead moves for a more definite statement under Fed.

R. Civ. P. 12(e).  The allegations of the 3AC as to MWL provide
this defendant with enough specific information to permit it to
frame a responsive pleading.  <u>See</u> 3AC at ¶¶ 240, 242, 246, 249,
252-57, 259, 262, 266, 270, 274.

<u>Al Rajhi Banking & Investment Corporation (Al Rajhi)</u>

Al Rajhi identifies itself as the largest retail bank
in Saudi Arabia, with hundreds of branches and millions of
depositors, all in Saudi Arabia.  Plaintiffs' central allegation
against Al Rajhi is that "[t]he banking Defendants in the lawsuit
[of which Al Rajhi is identified as one] have acted as
instruments of terror, in raising, facilitating and transferring
money to terrorist organizations."  3AC at ¶ 46.  The 3AC also
contains several allegations involving the al Qaeda ties of
Sulaiman Abdulaziz al-Rajhi (the managing director of Al Rajhi)
and Saleh Abdulaziz al-Rajhi (chairman of Al Rajhi), one of which
is that Sulaiman al-Rajhi "has provided material support and
sponsorship to al Qaeda and international terrorism *through the
al-Rajhi Bank & Investment Corporation . . . .*"  3AC at 136
(emphasis supplied).  The 3AC further states that Al Rajhi is the
"primary bank for a number of charities that serve as al Qaeda
front groups," 3AC at ¶ 85, including defendants Al-Haramain,
MWL, and the International Islamic Relief Organization, all of
which allegedly "funnel terrorism financing and support through
the al-Rajhi Banking & Investment Corporation financial system."
<u>Id.</u>

- 44 -

Except for the allegation of ¶ 46, <u>supra</u>, that Al Rajhi is one of a number of banks that "have acted as instruments of terror, in raising, facilitating and transferring money to terrorist organizations," the 3AC fails to state a claim against Al Rajhi upon which relief can be granted. The act of providing material support to terrorists, or "funneling" money through banks for terrorists is unlawful and actionable, but -- again, except for ¶ 46 -- Al Rajhi is alleged only to be the funnel. Plaintiffs offer no support, and we have found none, for the proposition that a bank is liable for injuries done with money that passes through its hands in the form of deposits, withdrawals, check clearing services, or any other routine banking service.[18]

The complaint against Al Rajhi cannot be dismissed outright because of ¶ 46 of the 3AC and the liberal pleading provisions of Rule 8(a), so strongly confirmed by <u>Sparrow</u> and <u>Swierkiewicz</u>. Al Rajhi may, however, serve a Rule 12(e) request

---

[18] The 3AC asserts claims against members of the al-Rajhi family who are bank officers, but it makes no allegations that would support an inference that any al-Rajhi family member was acting within the scope of his bank employment when he allegedly provided support to al Qaeda, as would be necessary to impose vicarious liability on the bank for the acts of its officers and employees. <u>See, e.g.</u>, <u>Tasso v. Platinum Guild Int'l</u>, No. 94CIV8288, 1997 WL 16066, at *6 (S.D.N.Y. Jan. 16, 1997) (dismissing claims against corporate defendant because of plaintiff's failure to plead facts from which inference could be drawn that individual defendant's actions were in furtherance of employer's business, which is part of scope of employment test).

for a more definite statement upon plaintiffs and may have leave
to renew its Rule 12(b)(6) motion after receiving plaintiffs'
response –- and before it will be required to respond to
plaintiffs' jurisdictional discovery.

Normally, of course, the basis for requiring a more
definite statement under Rule 12(e) "is unintelligibility, not
mere lack of detail." Towers Tenant Ass'n, Inc. v. Towers Ltd.
P'ship, 563 F. Supp. 566, 569 (D.D.C. 1983) (citations omitted);
Lunayach Communications Consultants, Inc. v. Zackiva
Communications Corp., No. 87-2296, 1988 WL 4245, at *2 (D.D.C.
Jan. 4, 1988). However, there is reason to think that, in the
wake of Swierkiewicz and Sparrow, Rule 12(e) may enjoy a
revitalized role in federal practice. See Hoskins v. Poelstra,
320 F.3d 761, 764 (7th Cir. 2003).[19]

Soliman J. Khudeira (Khudeira)

_____

[19] Al Rajhi has argued that the claims against it should be
dismissed because they present a nonjusticiable political
question. "The political question doctrine excludes from
judicial review those controversies which revolve around policy
choices and value determinations constitutionally committed for
resolution to the halls of Congress or the confines of the
Executive Branch." Japan Whaling Assoc. v. Am. Cetacean Soc'y,
478 U.S. 221, 230 (1986). Without deciding whether any defendant
may successfully present this argument, I find no such issue as
to Al Rajhi. See Baker v. Carr, 369 U.S. 186, 217 (1962)
(identifying six factors to be considered in political question
inquiry); see generally Comm. of United States Citizens Living in
Nicaragua v. Reagan, 859 F.2d 929, 934 (D.C. Cir. 1988)
(suggesting that political question doctrine may serve to bar
some claims but not others).

Except for the fact that his name is listed in the caption, Khudeira is mentioned only once in the 3AC, at ¶ 228, which alleges without any detail that he is among the "[c]o-conspirators" and "aiders and abettors" of defendant Benevolence International Foundation (BIF) (D61), a charity organization headquartered in Illinois whose chief executive officer in recent years was defendant Enaam Arnaout (D65), now alleged to be under indictment for his role in sponsoring al Qaeda.  3AC at ¶ 181. The 3AC contains a number of allegations about Arnaout's and BIF's ties with Osama bin Laden and al Qaeda, several of which refer to "co-conspirators" of BIF and Arnaout, a label that purportedly includes Khudeira.  See 3AC at ¶¶ 203-08, 213, 223.

There is no heightened pleading requirement for civil conspiracy, nor is civil conspiracy exempt from the operation of Rule 8(a), Sparrow, and Swierkiewicz.  See Hoskins, 320 F.3d at 764 ("Rule 9(b) has a short list of matters (such as fraud) that must be pleaded with particularity; conspiracy is not among them . . . .  [A]ny of our older opinions requiring more than notice of the time, scope, and parties cannot be squared with Swierkiewicz and conspiracy's absence from the list in Rule 9(b)") (internal citations omitted); Walker v. Thompson, 288 F.3d 1005, 1007 (7th Cir. 2002) ("[I]t is enough in pleading a conspiracy merely to indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is

charged with"); <u>Burrell v. State Farm & Casualty Co.</u>, 226 F.

Supp. 2d 427, 440 (S.D.N.Y. 2002).  Indeed,

> The courts have recognized that the nature of
> conspiracies often makes it impossible to provide
> details at the pleading stage and that the pleader
> should be allowed to resort to the discovery process
> and not be subjected to a dismissal of his complaint.
> Nonetheless, the complaint must contain sufficient
> information for the court to determine whether or not a
> valid claim for relief has been stated and to enable
> the opposing side to prepare an adequate responsive
> pleading.

5 Charles Alan Wright & Arthur R. Miller, <u>Federal Practice &</u>

<u>Procedure (Second)</u> § 1233 (1990) (internal citations omitted).

The 3AC's allegations of Khudeira's involvement in a

conspiracy with BIF and Arnaout are nonetheless too vague to

permit an understanding of just what Khudeira has been charged

with, or what he must defend.  Should Khudeira deem himself named

in every paragraph that contains allegations about "co-

conspirators" of BIF?  <u>See, e.g.</u>, 3AC at ¶ 205 ("Defendant

Arnaout and BIF co-conspirators kept secret . . . Defendant

Arnaout's relationship with organizations engaging in violence,

including al Qaeda and Osama Bin Laden"); 3AC at ¶ 207

("Defendant BIF and Arnaout and co-conspirators agreed to provide

and attempt to provide material support and resources to persons,

groups and organizations engaged in violent terrorist activities,

including al Qaeda . . . "); 3AC at ¶ 213 ("In or about November

1995, Defendant Arnaout and other members of the BIF conspiracy

caused the shipment of anti-mine boots to Baku, Azerbaijan, ultimately destined for the Chechen mujahideen"). Khudeira may make a Rule 12(e) request for more definite statement and may, upon receiving a response, renew his motion to dismiss.

An appropriate order accompanies this memorandum.


                              JAMES ROBERTSON
                         United States District Judge